**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MICHAEL FLOYD HOWARD, III,**

  **Plaintiff,**

**vs.**            **CIVIL ACTION NO. 3:19-CV-00006**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

  **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security which discontinued the Plaintiff's Supplemental Security Income ("SSI") benefits he received as a child when he attained the age of 18. By Order entered January 4, 2019 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 12, 13)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for reinstatement of SSI benefits or for remand (ECF No. 12), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 13); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from the Court's docket for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff, Michael Floyd Howard, III, (hereinafter referred to as "Claimant"), received a Disability Redetermination Decision dated May 6, 2015 advising him that his SSI benefits will stop. (Tr. at 86-89) On June 15, 2015, Claimant submitted a Request for Redetermination. (Tr. at 90) On September 11, 2015, a Disability Hearing Officer held a hearing on Claimant's appeal (Tr. at 97-108) and determined that Claimant's disability had ceased in May 2015. (Tr. at 109-118) On September 24, 2015, the Social Security Administration ("SSA") affirmed the Disability Hearing Officer's decision. (Tr. at 119-121) On November 20, 2015, Claimant filed a written request for a hearing. (Tr. at 11, 122-134)

An administrative hearing was held on September 17, 2017 before the Honorable Laura R. Bernasconi, Administrative Law Judge ("ALJ"). (Tr. at 27-61) On December 6, 2017, the ALJ entered an unfavorable decision. (Tr. at 8-26) On February 8, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 173) The ALJ's decision became the final decision of the Commissioner on October 31, 2018 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On January 1, 2019, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 12), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 13). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 21 years old at the time of the administrative hearing and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 416.963(c). (Tr. at 32) Claimant left school after the sixth grade but later obtained his GED. (Id.) He briefly worked on a short-term contract with a dog pound by cleaning up after the dogs, however, this was not at substantial gainful activity levels, but in order to maintain his food stamps. (Tr. at 33) Claimant left this work when he experienced a panic attack and never returned. (Tr. at 34)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

work. Id. § 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review process." Id. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision

must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 416.920a(e)(4).

### Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant attained the age of 18 on September 5, 2014 and was eligible for supplemental security income benefits as a child for the month preceding the month in which he turned 18; the ALJ also determined that Claimant was notified that he was found no longer disabled as of May 6, 2015. (Tr. at 13, Finding No. 1) Next, the ALJ found that Claimant since May 6, 2015, he had the following severe impairments: major depressive disorder; social anxiety disorder; agoraphobia; intermittent explosive disorder; and attention deficit hyperactivity disorder (ADHD). (Id., Finding No. 2)

The ALJ then concluded that since May 6, 2015, Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 14, Finding No. 3) The ALJ then found that since May 6, 2015, Claimant had the residual functional capacity ("RFC")

to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, repetitive tasks not on a production-rate basis. The claimant can have only superficial interactions with coworkers and supervisors, and no interaction with the general public. During the initial learning phase, he would need reminders every two hours but once the job was learned, no reminders would be necessary. The claimant must not work in close proximity with others.

(Tr. at 15-16, Finding No. 4)

The ALJ found Claimant had no past relevant work. (Tr. at 19, Finding No. 5) In addition to the immateriality of the transferability of job skills because Claimant had no past relevant work, his age, education, work experience and RFC, the ALJ determined that there were other jobs that

existed in significant numbers in the national economy that Claimant could perform. (Tr. at 20, Finding Nos. 6-9) Finally, the ALJ determined Claimant's disability ended on May 6, 2015 and had not become disabled again since then. (Tr. at 21, Finding No. 10)

**Claimant's Challenges to the Commissioner's Decision**

In support of his appeal, Claimant asserts that the ALJ erred by giving only limited weight to the opinion provided by Brian P. Bailey, M.A., a psychological consultative examiner, because he noted significant impairment in Claimant's mental functioning that were not included in the ALJ's RFC assessment. (ECF No. 12 at 5) The ALJ could have proffered interrogatories to Mr. Bailey had she any questions regarding Claimant's limitations. (Id.) Claimant also argues that the ALJ impermissibly disregarded the vocational expert's testimony that Claimant would be incapable of substantial gainful activity if he were to have no interactions with the general public and coworkers and only superficial interaction with supervisors. (Id. at 6)

Claimant requests this Court reverse the final decision for reinstatement of benefits or to remand to correct these errors. (Id.)

In response, the Commissioner contends that the ALJ appropriately gave Mr. Bailey's report limited weight because it was vague, and explicitly gave sound reasons for the limited weight by noting that some of Mr. Bailey's findings were based on Claimant's reported symptoms as opposed to medical opinion. (ECF No. 13 at 10-11) Further, Mr. Bailey's opinion was inconsistent with the observations during the mental examination. (Id. at 11) The Commissioner also argues that the ALJ appropriately tailored the RFC to Claimant's credibly established limitations, which included that Claimant be limited in his contact with others, which was verified by the vocational expert's own testimony. (Id. at 11-13) The ALJ is not duty-bound to accept the

testimony of a vocational expert's responses to hypothetical questions that are not supported by the evidence of record. (Id. at 13) The Commissioner asks this Court to affirm the final decision because it is supported by the substantial evidence. (Id. at 13-14)

**The Relevant Evidence of Record**[1]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Early Psychological Evaluation Report:

Rosemary Cook, Ed. S., NCSP, evaluated Claimant in 2004 when he was in second grade because of academic and behavioral difficulties. (Tr. at 337-341) Ms. Cook evaluated Claimant over the course of two days during which she administered several tests. (Tr. at 338-340) In summarizing his performance during the testing, Ms. Cook described Claimant as "a friendly boy whose general intellectual functioning falls within the low average range." (Tr. at 341) Ms. Cook opined that Claimant would learn best with oral instructions accompanied by written instructions and examples. (Id.) She recommended that he be seated near the teacher and away from distractions. (Id.) In addition, she opined that he "may require extra attention and encouragement for completion of assignments." (Id.)

State Agency Psychological Consultants:

John P. Todd, Ph.D. performed a Psychiatric Review Technique to determine Claimant's mental RFC in connection with his redetermination of benefits on March 7, 2015. (Tr. at 347-364) Dr. Todd found that Claimant suffered from affective disorders and anxiety-related disorders. (Tr. at 347) With respect to Claimant's affective disorders, Dr. Todd noted that Claimant's "[major

---

[1] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

depressive disorder was] in partial remission." (Tr. at 350)

With respect to Claimant's anxiety-related disorders, Dr. Todd classified Claimant as having a "persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity, or situation." (Tr. at 352) More specifically, Dr. Todd found that Claimant experienced "social anxiety." (Id.) Based on the foregoing, Dr. Todd opined that Claimant had a moderate limitation in his activities of daily living and social functioning; a mild limitation in maintaining concentration, persistence or pace; and no episodes of decompensation. (Tr. at 357)

Dr. Todd opined that Claimant was not significantly limited in any area of "understanding and memory" or "sustained concentration and persistence" (except for the ability to work in coordination with or proximity to others without being distracted by them, for which he found Claimant to be "moderately limited"). (Tr. at 361) According to Dr. Todd, Claimant was not significantly limited in his "ability to ask simple questions or request assistance" or "maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness," but had moderate limitations in interacting "appropriately with the general public," "accept[ing] instructions and respond[ing] appropriately to criticism from supervisors" and "get[ting] along with coworkers or peers without distracting them or exhibiting behavioral extremes"). (Tr. at 362)

Finally, Dr. Todd opined that Claimant was not significantly limited in any area of "adaptation." (Id.) In sum, Dr. Todd opined that Claimant's mental RFC required "limited contact [with] others [but] otherwise appears able to learn and perform routine repetitive type tasks." (Tr. at 363)

On July 31, 2015, Jeff Boggess, Ph. D. affirmed Dr. Todd's assessment as written. (Tr. at

392)

    <u>Psychological Consultative Examiner:</u>

    Brian P. Bailey, M.A. evaluated Claimant on February 17, 2015 in connection with Claimant's redetermination of benefits. (Tr. at 395-399) Generally, he observed that there "were no signs of sensory or psychomotor deficits which would have adversely affected the results, though insufficient effort on [Claimant's] part may have diminished the validity of psychological results." (Tr. at 395) Claimant explained that he was applying for disability benefits because "I've got anger issues, unable to pay attention too long and I don't like going out of the house. I start to panic and I'm afraid of a bunch of people." (<u>Id</u>.)

    Claimant reported that he had experienced anger issues for a "long time," but that the anxiety began "2-3 years" ago. (<u>Id</u>.) Claimant attributed "much of his anger" over "concerns regarding his sister's affairs (e.g. her possible involvement with negative peers)." (Tr. at 395-396)

    With respect to treatment, Claimant reported that "he received psychiatric consultation and individual psychotherapy through Prestera [a behavioral health center], though he reported no benefit from the services, resulting in his decision to discontinue." (Tr. at 396)

    Mr. Bailey administered four tests during the evaluation: Confidence Intervals ("CI"); Mental Status Examination ("MSE"); the Weschsler Adult Intelligence Scale ("WAIS-IV"); and the Wide Range Achievement Test, Fourth Edition ("WRAT-4"). (Tr. at 395) On his intellectual assessment, Claimant received a full scale IQ of 74, which was "significantly below the IQ results … from 2004." (Tr. at 397) Mr. Bailey concluded that the intelligence test results were "invalid, as both internal and external factors indicate invalid results. (Tr. at 397-398) A similar issue arose with respect to Claimant's WRAT-IV results, which Mr. Bailey noted Claimant "gave up easily

on certain items, particularly those involving math computation" and that the results "may underestimate his current levels of academic achievement." (Tr. at 398)

On his MSE, Claimant's attitude/behavior was "cooperative" and there were "no signs of disruptive behavior;" his orientation to person, place and time was "good;" his mood and affect were "mildly agitated;" his thought process was "lucid;" his thought content exhibited "no signs of delusional thinking obsessions, or morbid preoccupation, though he did report a number of symptoms consistent with social phobia;" he reported "no past perceptual abnormalities;" his insight was "fair;" his judgment was "average;" he denied any suicidal or homicidal ideations; his immediate, recent and remote memory were "within normal limits;" his concentration was "mildly deficient;" his persistence was "mildly-moderately deficient;" and his pace was "mildly deficient." (Id.)

Based on the foregoing, Mr. Bailey opined that Claimant's "anxiety related problems have caused clinically significant distress or impairment in social, occupational, or other important areas of functioning." (Tr. at 399) Further, Claimant's major depressive disorder was in "partial remission" and Claimant "described limited symptoms of major depressive disorder, below the threshold necessary for a more severe major depressive disorder diagnosis[.]" (Id.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that severe anxiety and anger issues prevent him from working. (Tr. at 34) He receives treatment for these conditions and takes Prozac. (Tr. at 34-35) He explained that social settings, being around people and being out of the house, make him anxious. (Tr. at 35) Claimant does not have a driver's license and he hates being in the car, but he will go to his

appointments, though it makes him nervous. (Id.) He explained that when he's nervous, he has panic attacks, and estimated that his panic attacks last up to an hour and feels like he can't breathe. (Tr. at 35-36)

Claimant testified that he was diagnosed as bi-polar, but he thinks he's normal. (Tr. at 36) Regarding his anger issues, Claimant explained that people annoy him, and if they "keep pestering me" it makes him "super mad" and if they were to keep pestering him, he will end up "breaking something." (Id.)

He stated that he lived with his mother, sister and grandmother. (Tr. at 37) He spent his time "lying about", he does not go outside. (Id.) Claimant testified that he has no friends, he keeps to himself. (Id.)

Linda Crabtree Testimony:

Mrs. Crabtree represented that she is Claimant's step-grandmother. (Tr. at 29) She testified that family members would provide Claimant a ride to and from the dog pound when he worked there. (Tr. at 38) She stated that Claimant did not work eight hours a day, and that it would vary from two to three hours; he worked there about a couple of months. (Tr. at 38-39)

Mrs. Crabtree testified that she and other family members cannot get Claimant out of the house without it being a fight; she described an incident where Claimant got mad at her, picked her up and set her down on the floor. (Tr. at 39) She stated it was a "constant battle every day." (Id.) She testified that most people are afraid of Claimant. (Id.)

She testified that Claimant will not get his driver's license even though his grandfather has a car lot and he can have any car of his choosing. (Id.) She stated that Claimant does not go to bed at normal hours, usually 4:00, 5:00 or 6:00 in the morning, and that he sleeps all day. (Id.) Mrs.

Crabtree stated that if she tried to get Claimant up to go to an appointment or to lunch with the family, "you may get whipped, you may get jumped. It's hard to tell." (Tr. at 39-40) She stated that its best to approach him to see how his mood is. (Tr. at 40)

Mrs. Crabtree confirmed that Claimant had been diagnosed with ADHD and that he may play games for about five minutes but then he loses interest and doing something else. (Tr. at 40-41) She stated that Claimant does not read though "by the grace of God" he obtained his GED. (Tr. at 41)

Mrs. Crabtree noted no improvement in Claimant's medications and wondered if Claimant was "just telling the doctor that he feels the doctor needs to hear." (Tr. at 43) She confirmed that Claimant has no friends whatsoever, that he plays video games when he can concentrate on them, but most of the time she explained that Claimant sleeps or argues with his sister, depending on his mood when he wakes up. (Tr. at 43-44) Mrs. Crabtree testified that before Claimant dropped out of school, he did not associate with other kids well and that his mother attempted to homeschool him, but "failed." (Tr. at 44)

Mrs. Crabtree testified that she makes sure the bills are paid looks after Claimant's household as neither Claimant nor his mother are able to do so. (Tr. at 45-46) Mrs. Crabtree had been Claimant's payee when he received his SSI benefits. (Tr. at 45) She explained that when Claimant worked at the dog pound, she or another family member was very close at hand, either playing with the dogs or waiting in the vehicle in the parking lot. (Tr. at 47)

Mrs. Crabtree stated that she has observed Claimant have a panic attack probably twice a week, and described it as him getting anxious and losing his breath. (Id.) She explained that she and family members would have a hard time calming Claimant down because "he becomes a little

violent." (Id.) She stated that Claimant does not leave the house at all unless he has an appointment, such as doctor's appointments or the hearing, otherwise he does not leave the house. (Tr. at 48) Mrs. Crabtree testified that Claimant does not like people, that he sleeps near the living room door to make sure no one comes in. (Id.)

Mrs. Crabtree testified that she has tried to get Claimant to clean his room, which is the living room, but he won't do it even when help is offered. (Tr. at 49-50) She stated that he will not shower or bathe unless he has an appointment and Claimant will have to prompted. (Tr. at 50) She stated that Claimant would not be able to stay on a schedule and cited the experience at the dog pound. (Id.) She explained that "[u]nless you're going to let us go with him to work, it's not going to work" and that Claimant is permitted to leave when he wants. (Tr. at 51) With respect to authority figures, Mrs. Crabtree only seen Claimant react to his grandfather, that he attacked him, and that his grandfather is about 6' and weighs 350 pounds; she stated that Claimant told him that he would kill him and set him on fire. (Id.) Mrs. Crabtree speculated that what triggered this reaction was that Claimant's grandfather asked him to do something. (Tr. at 51-52) Mrs. Crabtree warned that if someone were to ask Claimant to do something and "stay on him" to "get ready for a fight." (Tr. at 52) Mrs. Crabtree testified that she does not think Claimant would be capable of working an eight-hour day even with very little contact with others. (Id.)

Mrs. Crabtree thinks that Claimant has gotten worse since he first received benefits as a child in 2008. (Id.) Mrs. Crabtree testified that Claimant has no interest in anything – no girls, friends, cars, nothing. (Tr. at 53) She explained that Claimant went through the welfare office to get his GED, but it took him several tries. (Tr. at 54)

14

Anthony T. Michael, Jr., Vocational Expert ("VE") Testimony:

The VE testified that a hypothetical individual of Claimant's age, work history and education; with no exertional limitations; with non-exertional limitations where the individual could only perform simple, repetitive tasks not on a production-rate basis; can only have occasional interaction with supervisors and coworkers and no interaction with the general public; that during the initial learning phase would need reminders every two hours, but once the job was learned, no reminders necessary; and must not work in close proximity with others, the individual could perform the heavy level job of a commercial cleaner, and at the medium level, a laundry worker and a night cleaner, and at the light level, a garment bagger. (Tr. at 56-57)

With the added limitation that the hypothetical individual could only have superficial interaction with coworkers and supervisors and no interaction with the general public, the VE testified that the individual could only perform the night cleaner job. (Tr. at 57-58) The VE testified further that if the individual were to have no interaction with coworkers and superficial interaction with supervisors, then there would be no jobs. (Tr. at 58)

The VE testified that for entry-level employment, typically no more than one day a month absenteeism would be tolerated and that if a person were to be off task in excess of 10 percent of the workday, the individual would not be retained. (Tr. at 59) The VE testified that if a person were to be shown how to perform a job, or was being trained beyond the expected period of time to learn the job, that it would depend on the individual employer's tolerance, but then after the expected learning period, it would become an accommodation to do the job. (Tr. at 60)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Evaluation of Opinion Evidence:

The Regulations provide the definition for "medical opinions":

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 416.927(a)(1). The Regulations further provide that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."

Id. § 416.927(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." Id. § 416.927(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. Id. § 416.927(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. § 416.927(d)(3).

At step three in the sequential evaluation process, the ALJ performed the "special technique" under Section 416.920a: in understanding, remembering, or applying information, the ALJ found that Claimant had a moderate limitation, noting that in his Function Report he alleged problems with understanding and following both written and oral instructions. (Tr. at 14, 242) Moreover, the ALJ noted Claimant's invalid full-scale IQ score of 74 from his February 2015 evaluation (Tr. at 14, 397-398), and that his academic testing revealed "significant mathematics delays but intact reading at an eleventh-grade level, and the claimant displayed intact delayed recall of four out of four objects. (Tr. at 14-15, 398) Also, the ALJ considered Claimant's recent GED certificate. (Tr. at 15)

In interacting with others, the ALJ found Claimant to have a marked limitation, noting his testimony that he becomes easily annoyed with others and has high anxiety in social settings. (Id.)

17

The ALJ also noted Mr. Bailey's consultative report that Claimant exhibited impatience and was mildly agitated and did not speak spontaneously. (Tr. at 15, 398) Another psychiatric evaluation in September 2015 indicated Claimant had irritability and a blunted affect. (Tr. at 15, 493) The ALJ acknowledged more recent records suggested Claimant had improved control of his irritability. (Tr. at 15, 472)

In concentrating, persisting, or maintaining pace, the ALJ found Claimant had a moderate limitation, noting that he alleged problems with maintaining focus. (Tr. at 15, 237) Again, the ALJ considered Mr. Bailey's conflicting findings that Claimant exhibited "mild to moderate persistence issues" but also "mild deficits in concentration and pace" (Tr. at 15, 398), and that more recent psychiatric records indicated Claimant had "no deficits in concentration." (Tr. at 15, 479)

Finally, in the area of adapting or managing oneself, the ALJ found Claimant had a moderate limitation, noting Claimant's testimony including a history of panic attacks and in his Function Report he stated he did no cooking and could not manage his own money. (Tr. at 15, 239-240) The ALJ contrasted this with the statements Claimant made to his psychiatrists that indicated infrequent panic attacks, "with resolution of intense symptoms after a few minutes" (Tr. at 15, 475) and that he advised Mr. Bailey that he prepared some microwaveable meals and played video games despite not performing chores at home. (Tr. at 15, 399)

Later in the written decision, the ALJ acknowledged that Claimant "has a prolonged history of mental disorders, including episodes of agitation prior to the alleged onset date." (Tr. at 16, 415) The ALJ noted that Claimant continued to complain of anger episodes, panic attacks in public, and mood swings in September 2015 (Tr. at 16, 490, 493) as well as Mr. Bailey's observations during his evaluation and Mr. Bailey's opinion that Claimant's poor academic testing performance was

due to "low effort and frustration tolerance." (Tr. at 16-17, 397-398) The ALJ further noted Mr. Bailey's findings that Claimant had only mild deficiencies in concentration and pace, and that he was able to establish adequate rapport during the evaluation. (Tr. at 17, 398) The ALJ compared this with other psychiatric records that indicated Claimant had no problems in concentration or judgment and normal mood and affect, and no impairment of thought process or content. (Tr. at 17, 473, 476, 492, 493)

Significantly, the ALJ examined other non-medical evidence in assessing Claimant's allegations, noting that his testimony, as well as Mrs. Crabtree's testimony[2], suggested difficulty adapting to work stress and that Claimant's statements regarding his limitations in activities of daily living with respect to cooking, shopping, managing money or cleaning were inconsistent with his claim of generally intact personal care, that he fed his pets, and that he studied for and passed his GED examination; it was noted that treatment records also indicated that Claimant made efforts to find work, though he had interviewing difficulties and had other plans to enroll in culinary school. (Tr. at 17, 238-240, 472, 478, 481) In short, the ALJ found this to be inconsistent with the degree of isolation and lack of focus as alleged. (Tr. at 17)

The ALJ also determined Claimant's treatment history was also inconsistent with his allegations: while Claimant was mentally disabled for some time, he was noncompliant with therapy recommendations. (Tr. at 17, 421) The ALJ noted Claimant had been "out of treatment for

---

[2] When assessing the other opinion evidence of record from non-medical sources which included Mrs. Crabtree's opinion, the ALJ noted that although the record demonstrated Claimant showed some agitation, persistent deficiencies, and impatience that was "partially consistent" with Mrs. Crabtree's opinions (Tr. at 397-398), the ALJ found these statements inconsistent with the evidence as a whole, and specifically noted that no statements to doctors included physical aggression towards others and that despite Mrs. Crabtree's testimony that she suspected Claimant minimized his symptoms to his psychiatrist, the ALJ noted that the "psychiatry notes suggest that the claimant's family agreed that he had been progressing well with treatment." (Tr. at 19, 478, 484)

several years"[3] prior to his examination by Mr. Bailey in February 2015 (Tr. at 17, 238), and began treatment in September 2015 and since that time, Claimant reported a "steady decline in symptom frequency and severity." (Tr. at 17, 472, 475, 487)

Next, the ALJ reviewed the opinion evidence, including the 2004 examination provided by Rosemary Cook, Ed.S. Acknowledging that her opinion predated the relevant period at issue by over ten years, and related more to school functioning than to performing work tasks, the ALJ found that Dr. Cook's opinion that Claimant learned best from oral instructions accompanying written instruction and required shortened assignments and extra time on written work was consistent with Mr. Bailey's opinion that Claimant had mild pace and persistence problems where Claimant had the ability to perform shortened tasks without strict time demands. (Tr. at 17-18, 341, 398) For this reason, the ALJ gave Dr. Cook's opinion "some weight notwithstanding its age." (Tr. at 18)

The ALJ then determined that Mr. Bailey's statement that Claimant's "anxiety caused clinically significant impairment in social, occupational, or other areas of functioning" was "vague". (Tr. at 18, 399) The ALJ further explained that Mr. Bailey's statement "is rendered in the context of a description of the claimant's symptoms, making it unclear whether it reflects [M]r. Bailey's independent opinion of the claimant's limitations." (Tr. at 18) Nevertheless, the ALJ credited Mr. Bailey's "observations of impatience, mild to moderate persistence deficits, and overly vague response patterns would support limitations in the claimant's ability to function."

---

[3] Claimant reported to Mr. Bailey that he had previously been treated for behavioral issues at the Prestera Center "until approximately two years ago." (Tr. at 396) Records provided by the Prestera Center indicate that in September 2010 Claimant had been discharged from the program because Claimant "rejected additional treatment" and had missed several appointments (Tr. at 448) and in was again discharged from the program in April 2011 because he "rejected additional treatment" and had not received any services since October 19, 2010. (Tr. at 452)

(Tr. at 18, 398) Ultimately, the ALJ gave Mr. Bailey's opinion "limited weight due to its vagueness." (Tr. at 18)

In sum, the ALJ provided an adequate explanation for discounting Mr. Bailey's mental assessment allowing for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983). The ALJ's summary of both the medical and other evidence of record provided the necessary narrative in her determination that Mr. Bailey's opinion was entitled to limited weight; accordingly, the undersigned **FINDS** the ALJ's evaluation of Mr. Bailey's opinion is supported by substantial evidence.

Claimant's RFC Assessment:

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See Social Security Ruling ("SSR") 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 416.945(a). The RFC determination is an issue reserved to the Commissioner. Id. § 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Although Claimant contends that the ALJ's RFC assessment failed to include all of his mental limitations, particularly those noted by Mr. Bailey (ECF No. 12 at 5), as discussed *supra*,

it is known that in addition to his burden of showing he has a medically determinable impairment, Claimant must demonstrate "a showing of related functional loss." See, <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4ᵗʰ Cir. 1986) (internal citation omitted). Just because Mr. Bailey diagnosed Claimant with Social Anxiety Disorder, with Panic Attacks and Major Depressive Disorder, in Partial Remission does not mean Claimant suffered significant functional deficits rendering him disabled.

To the extent that Claimant argues that the RFC is "fatally flawed" because it allows for the performance of work at "all exertional levels" (ECF No. 12 at 5), the undersigned notes that Claimant does not expound on this, but ostensibly suggests that the ALJ failed to consider Claimant's physical impairments.[4] Should that be the case, it is noted that the ALJ did consider Claimant's physical impairments: obesity; complaints of chronic back and knee pain; acid reflux symptoms; and anxiety-related abdominal pain. (Tr. at 13-14) None of these physical impairments were deemed severe. (<u>Id</u>.) In short, the evidence related to these impairments did not indicate Claimant suffered any significant limitation in his physical ability to do basic work activities. <u>See</u> 20 C.F.R. § 416.920(c). Indeed, the ALJ acknowledged there was a lack of objective evidence to support any significant physical limitations, which was particularly demonstrated by the physical examination provided by medical consultant Kip Beard, M.D. (Tr. at 13-14, 365-370) The ALJ further noted that Dr. Beard's findings were corroborated by State agency medical consultants Drs. Rogelio Lim and Rabah Boukhemis, who both opined Claimant "has no significant physical limitations." (Tr. at 14, 371-379, 394) Accordingly, to the extent that Claimant suggests that the RFC is flawed for failure to include any limitations related to his physical impairments, the

---

[4] The ALJ noted that Claimant "alleges disability due to depression, anxiety, agoraphobia, explosive disorder, and ADHD." (Tr. at 16, 237, 240, 242-243) The ALJ references Claimant's Function Report that is dated January 23, 2014 (Tr. at 240-244); the undersigned notes that Claimant alleged no physical conditions or impairments that prevent him from working therein.

undersigned **FINDS** the RFC as it relates to Claimant's alleged physical impairments is supported by the substantial evidence.

With respect to Claimant's argument that the ALJ could have proffered interrogatories to Mr. Bailey to answer any additional questions regarding his opinion, it is known that an "ALJ's duty to assist in developing the record is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." See, Spurlock v. Berryhill, No. 3:17-CV-02240, 2018 WL 1956119, at *12 (S.D.W. Va. Apr. 2, 2018) (M.J. Eifert), *report and recommendation adopted by*, Spurlock v. Berryhill, 2018 WL 1954835 (S.D.W. Va. Apr. 24, 2018) (quoting Lichlyter v. Astrue, No. 6:11-CV-00597, 2012 WL 4378142, at *2 (S.D.W. Va. Sept. 25, 2012) (citations omitted). In this case, the ALJ had an adequate record of evidence that was unambiguous allowing for proper evaluation of same; additionally, an ALJ is vested with discretion as to whether further evidence or clarification is needed from a medical source. See 20 C.F.R. § 416.920b(b).

Finally, with respect to Claimant's assertion that the ALJ impermissibly disregarded the vocational expert's testimony that he would be incapable of substantial gainful activity if he could have no interaction with the general public and coworkers and only superficial interaction with supervisors (ECF No. 12 at 6), this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7.

Following her discussion of all the relevant evidence of record, the ALJ reconciled the

conflicting evidence, and determined that Claimant's mental limitations did not preclude him from all work activity:

> Considering the inconsistent evidence of the claimant's daily activities, the limited findings of concentration deficiency, and the severe but steadily improving symptoms of social anxiety and explosive temper, the undersigned finds these allegations partially supported. The claimant remains markedly limited in social interaction, and can have no public interaction and only superficial workplace contact with others. However, the claimant can perform simple tasks not at a production pace, consistent with moderate limitations in persistence, concentration, and comprehension. His moderate limitations in adaptation and memory would further require a periodic need for reminders during an initial learning period, although he would not require further reminders for tasks after learning them.

(Tr. at 18)

The RFC assessment concerning both Claimant's non-exertional limitations included the required narrative discussion that allows for meaningful judicial review and with respect to the findings of fact and conclusions provided in the written decision, it is clear that the ALJ complied with the mandate to "build an accurate and logical bridge from the evidence to [her] conclusion." Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

In sum, the undersigned **FINDS** the RFC assessment with respect to Claimant's mental impairments is supported by substantial evidence.

## **Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reinstatement of SSI benefits or remand (ECF No. 12), **GRANT** the Defendant's request to affirm the decision below (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: May 21, 2019.

Omar J. Aboulhosn
United States Magistrate Judge